

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-05-00023-CR

_____

RENE FLORES, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 228th Judicial District Court
Harris County, Texas
Trial Court No. 963443

Before Morriss, C.J., Moseley and Carter, JJ.
Memorandum Opinion by Chief Justice Morriss

MEMORANDUM OPINION

In this murder case, on remand from the Texas Court of Criminal Appeals, the sole issue before us is whether the trial court's error in instructing the jury on provocation[1] caused some harm to appellant, Rene Flores. *See* TEX. CODE CRIM. PROC. ANN. art. 36.19 (Vernon 2006); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g).

On original submission of this case before us, we found that the trial court erred in instructing the jury on the law of provocation, in answer to Flores' assertion of self-defense; yet we found the error harmless and affirmed Flores' conviction for murder. *Flores v. State*, 194 S.W.3d 34 (Tex. App.—Texarkana 2006), *vacated & remanded*, 224 S.W.3d 212 (Tex. Crim. App. 2007). The Texas Court of Criminal Appeals vacated our opinion because this Court used the wrong standard in conducting our harm analysis. That court remanded this case to us[2] for us to perform a harm analysis in compliance with Article 36.19 of the Texas Code of Criminal Procedure.[3] On further review of

---

[1] The State's requested instruction on provocation was given immediately following, and as a qualification to, Flores' requested instruction on self-defense and instructed the jury, in essence, that no self-defense by Flores was authorized if he had intentionally provoked the behavior he was allegedly defending against, unless Flores abandoned the encounter or clearly communicated his intent to do so and the other party nonetheless continued or attempted to use unlawful force against Flores.

[2] *Flores v. State*, 224 S.W.3d 212 (Tex. Crim. App. 2007).

[3] In our earlier opinion, we analyzed this error using the standard of Rule 44.2(b) of the Texas Rules of Appellate Procedure. *See* TEX. R. APP. P. 44.2(b). The Texas Court of Criminal Appeals instructed us this was the wrong standard. Rather, we should have applied Article 36.19 of the Texas Code of Criminal Procedure.

the entire record, under the guidance of Article 36.19 and *Almanza*, we are convinced the charge error caused Flores no harm.

Flores testified at trial that, two weeks before the September 23, 2003, fatal shooting for which he was charged and convicted, he and his partner "Ronnie"—Flores said he did not know Ronnie's last name—met Damon "Blue" Barlow, who was to buy eight pounds of marihuana from Ronnie. The meeting happened at a fast food restaurant in Houston.[4] Flores and Ronnie were traveling in Flores' wife's car, and Barlow and Dezavies "Tucker" Taylor were traveling in a white Chevrolet Caprice driven by Taylor. From the restaurant, Taylor, Barlow, and unidentified persons in a gray Buick followed Flores and Ronnie to Ronnie's residence, where Ronnie got the marihuana and put it in the Caprice. Flores and Ronnie then got in the car with Barlow and Taylor, expecting to be paid for the marihuana. Instead, Taylor drove away, ultimately stopping—at Ronnie's instruction—at the home of Flores' mother. Flores testified he got out of the car at his mother's house "to head her off." When Flores returned to the Caprice, Barlow pulled a gun, ordered Ronnie out of the car, and pointed the gun at Flores. The Caprice then sped away, with no money having been exchanged for the marihuana. Flores' brother took Flores and Ronnie back to Ronnie's house where they had left Flores' wife's vehicle. Flores and Ronnie then attempted to locate the Caprice and, in the process, encountered the gray Buick. Flores pursued the Buick, but the passenger in that car started shooting toward them. Flores testified they were shot at nine or ten times before the

_____

[4]This case has been transferred to this Court as part of the Texas Supreme Court's docket equalization program.

3

driver of the Buick was able to elude them. None of the shots fired hit Flores, his wife, or Ronnie; neither did any of the shots hit the vehicle in which they were riding. After this incident, but before the date of the killing, Flores purchased an SKS semiautomatic assault rifle and three boxes of ammunition.

On September 23, 2003, Flores, using a fictitious name and a different telephone number, contacted Barlow and told him Flores had marihuana and wondered if Barlow would like to buy it. Flores and Barlow arranged a meeting at another fast food restaurant on Interstate 10. According to Flores, he arranged this meeting only so he could get the money from Barlow for the stolen marihuana. Flores went to this location with a friend, Jerry Thomas, in Thomas' green Toyota Camry. Thomas was driving. Before going, however, Flores placed his SKS semiautomatic assault rifle in the trunk of Thomas' car. Flores admitted at trial that he had no marihuana to sell Barlow on this occasion.

On the night of September 23, Barlow and three friends arrived at the restaurant parking lot in the white Chevrolet Caprice, with Barlow in the front passenger seat. According to Flores, the Caprice circled the parking lot and left. According to Anthony Onibokun, who was riding in the back seat of the car with Barlow, they waited at the designated place for about five minutes and, when no one showed up, they left. At any rate, when the Caprice left the parking lot, Flores and Thomas followed it onto Interstate 10.

4

According to Onibokun, someone in a car behind them opened fire on them; Barlow was killed, and the driver and another back-seat passenger were also shot. Photographs admitted into evidence showed several bullet holes in the right front passenger side door as well as on the trunk lid of the Caprice. Onibokun testified that no one in the Caprice had a weapon and that no one in that vehicle fired a shot toward the Camry from which Flores was shooting. There was no damage to the Camry which could confirm that any shots had been fired in its direction.

Flores admits in his brief before this Court that "his vehicle was chasing the vehicle in which the deceased was a passenger." Flores testified, however, that during this "chase" someone in the Caprice began shooting at the car in which Flores rode. He said that, in fear and in defense of his life, he climbed to the Camry's back seat, where he was able to access the trunk. He retrieved his rifle from that location and fired five to seven rounds at the Caprice. Barlow died as a result of some of these shots fired by Flores.

The trial court's charge to the jury included instructions on the law of self-defense, including the duty to retreat. The court, however, qualified this defense by also instructing the jury on provocation:

> You are further instructed as part of the law of this case, and as a qualification of the law on self-defense, that the use of force by a defendant against another is not justified if the defendant provoked the other's use or attempted use of unlawful force, unless
>
> (a) the defendant abandons the encounter, or clearly communicates to the other his intent to do so reasonably believing he cannot safely abandon the encounter; and

5

>    (b)     the other person, nevertheless, continues or attempts to use unlawful
>            force against the defendant.

The charge then instructed the jury that, if it found beyond a reasonable doubt that Flores committed some act or used some language, or a combination of both, with the intent "to produce the occasion for shooting Damon Barlow," and if such act or words of Flores were reasonably calculated to, and did "provoke a difficulty" wherein Barlow attacked Flores with deadly force or reasonably appeared to Flores to "so attack [Flores] or to be attempting to so attack [Flores]," and Flores then shot Barlow "in pursuance of his original design," the jury should convict Flores. It has been established that this charge on provocation was error. *Flores*, 194 S.W.3d at 38, *vacated & remanded on other grounds*, 224 S.W.3d 212.

Where a trial court's charge to the jury contains error, we should analyze the error for harm under the standard of Article 36.19. *See* TEX. CODE CRIM. PROC. ANN. art. 36.19. An appellate court will not reverse a conviction or sentence on the basis of jury charge error "unless the error appearing from the record was calculated to injure the rights of the defendant, or unless it appears that the defendant has not had a fair and impartial trial." TEX. CODE CRIM. PROC. ANN. art. 36.19. In *Almanza*,[5] the Texas Court of Criminal Appeals concluded that this language created two separate harm-analysis standards:  the first to be used when a timely objection is made to the charge; the second to be used when no such objection appears in the record. The first standard dictates that

---

[5]686 S.W.2d at 171.

6

reversal should occur if the defendant made a timely objection and if there is some harm to the defendant from the error. *Id.* at 171. Properly preserved jury-charge error requires reversal unless it is harmless.

Here, because Flores timely objected to the trial court's inclusion of an instruction on the language of provocation in the jury charge, his conviction must be reversed if he can show any degree of harm. In making this determination, "the actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Id.*; *see also Ovalle v. State*, 13 S.W.3d 774, 786 (Tex. Crim. App. 2000). The burden of proof lies with the appellant to persuade the reviewing court that he or she suffered some actual harm as a consequence of the charging error, and if he or she is unable to do so, the error will not result in a reversal of the conviction. *Abdnor v. State*, 871 S.W.2d 726, 732 (Tex. Crim. App. 1994).

"[T]he presence of *any* harm, regardless of degree, which results from preserved charging error, is sufficient to require a reversal of the conviction. Cases involving preserved charging error will be affirmed only if *no* harm has occurred." *Arline v. State*, 721 S.W.2d 348, 351 (Tex. Crim. App. 1986) (no harm where no definition of reasonable belief); *see also Cathey v. State*, 992 S.W.2d 460, 466 (Tex. Crim. App. 1999) (failure to instruct jury on accomplice-witness rule harmless error where sufficient evidence to convict defendant as principle).

7

On the other hand, the appellant must demonstrate actual, as opposed to possible, harm. *Medina v. State*, 7 S.W.3d 633 (Tex. Crim. App. 1999). Significant evidence militating against a defense-requested instruction or finding can render an error harmless. *Id.* at 642–43.

The State began to attack any self-defense theory in opening argument, telling the jury, "you will see that this is not self-defense. You will see that the defendant opened fire with an assault rifle on a car full of people on a freeway that even he admits had innocent people driving on it." The State argued that Flores had arranged the "drug deal" on the night of the killing, based on what had allegedly happened two weeks before, to retaliate against Barlow. Flores argued self-defense in his closing argument. In the State's closing rebuttal, it was urged that Flores had set up the second "buy" in order to retaliate against Barlow. "[Flores] was going there to show everybody that he wasn't going to put up with being robbed. That he was going to retaliate and show everybody that he was tough." Near the end of the State's argument, it returned to Flores' "duty to retreat" and that he could not provoke the acts against which he claimed to be defending himself. In the closing rebuttal, covering about ten pages of argument, the State made at least four references to Flores having planned the encounter and purchasing the gun.

Under the unchallenged instruction on self-defense, the jury was instructed to reject Flores' claim of self-defense if it found that "a reasonable person in [Flores'] situation would have retreated before using deadly force." Put another way, the jury could not have found that Flores acted in self-defense if it concluded that a reasonable person—chasing a vehicle down an urban highway and

8

being shot at from the pursued vehicle—would have retreated or broken off the pursuit before using deadly force in self-defense.

The erroneously given provocation instruction was, by its terms, a limitation on the self-defense instruction. Our job is to determine whether there was any harm, that is, whether, in the absence of the provocation instruction, there would have been any chance that the jury would have found that Flores acted in self-defense. To find that Flores acted in self-defense, the jury would need to be convinced of two things: (1) that, while the Flores vehicle chased the Barlow vehicle, someone in the Barlow vehicle shot at the Flores vehicle causing Flores to reasonably believe that deadly force was immediately necessary to protect himself and (2) that the situation was such that a reasonable person in Flores' situation would not have retreated before using deadly force in self-defense. Flores has not persuaded us that either question might have been answered in his favor. Therefore, he has not shown harm from the provocation instruction.

Flores initiated the encounter in question. He initially set up the false drug transaction with Barlow after having purchased an assault weapon which he brought to that meeting. He chased Barlow down the urban expressway at approximately 10:00 p.m. There was testimony by a passenger in the Barlow vehicle that no shot was fired from the Barlow vehicle and that there were not even any guns in that vehicle. The only contrary testimony came from Flores, who claimed shots came first from the Barlow vehicle and who also claimed that he neither buys nor sells drugs. The State also pointed out, on cross-examination of Flores, that, when he spoke to police immediately after the incident, he said only that their car had been run off the road and said nothing about any

9

shots coming from the other car. There were bullet holes in the Barlow vehicle, but none in the Flores vehicle. The bullet holes in the Barlow vehicle were both in the vehicle's rear and side. The only people shot were in the Barlow vehicle. Flores came into the encounter having every reason to be angry with Barlow; in fact, Flores had taken numerous steps calculated to respond to, even retaliate for, Barlow's theft of drugs from him two weeks earlier. The chase happened on a Houston expressway, and Flores was the pursuer. Nothing suggested that any conditions, such as heavy traffic, would have hindered Flores from stopping, slowing, or exiting the freeway entirely; thus, nothing demonstrated that Flores lacked a reasonable avenue of retreat should he have had any inclination to break off the chase. Nothing suggested that Flores was essentially trapped into using deadly force to defend himself. No evidence or inference suggests that a reasonable person in Flores' situation would not have retreated.

On this record, we cannot imagine the jury finding that Flores acted in self-defense, even without the provocation instruction. Therefore, we conclude the provocation instruction caused no harm.

We affirm the judgment of the trial court.


Josh R. Morriss, III
Chief Justice

Date Submitted:     June 22, 2007
Date Decided:       January 3, 2008

Do Not Publish